AES:MEB/HDM
F. #2016R0176

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | C O M P L A I N T |
| - against - | (18 U.S.C. § 1349) |
| JEFFREY AUERBACH, | 19-M-888 |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

Aristotelis Kougemitros, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

Upon information and belief, in or about and between July 2014 and September 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JEFFREY AUERBACH, together with others, did knowingly and intentionally conspire to execute a scheme and artifice (a) to defraud one or more persons in connection with one or more securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit: NXT-ID, as defined herein, and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations and promises in connection with the purchase and sale

1

of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit: NXT-ID, as defined herein, contrary to Title 18, United States Code, Section 1348.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I have been a Special Agent with the FBI since 2011. I am currently assigned to an FBI squad that investigates securities fraud, wire fraud and other financial crimes. During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.

2.  I have personally participated in the investigation of securities fraud, among other potential offenses, by the defendant JEFFREY AUERBACH, among others, as discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, (c) my review of documents, e-

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

mails and text messages, among other sources of evidence and (d) meetings and interviews with witnesses.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.   The Defendant, the Publicly-Traded Company and Co-Conspirators

4. The defendant JEFFREY AUERBACH was a United States citizen and resided in New York. In or about and between September 1993 and November 2013, AUERBACH was a registered representative of various broker-dealers. From approximately January 2015 to November 2016, AUERBACH was one of the principals of Excelsior Global Advisors, an investor relations firm. From approximately December 2013 to the present, AUERBACH has been a principal of World Wide Holdings, LLC, an investor relations firm that he created.

5. NXT-ID was a company whose shares trade publicly on the Nasdaq Stock Market ("the NASDAQ") under the ticker symbol NXTD. In public statements that it issued at various times, NXT-ID purported to "provide a comprehensive platform of

technology products and services that enable the Internet of Things (IoT)." It further stated, "With extensive experience in access control, biometric and behavior-metric identity verification, security and privacy, encryption and data protection, payments, miniaturization and sensor technologies, NXT-ID develops and markets groundbreaking solutions for payment and IoT applications. Its industry-leading technology products and solutions include MobileBio, a suite of biometric solutions that secure consumers' mobile platforms, the Wocket, a next-generation smart wallet and the Flye, a digital credit card developed in collaboration with WorldVentures."

6. NXT-ID's stock became registered under Section 12(g) of the Securities and Exchange Act (the "Exchange Act") in or about May 2013, and began trading on the OTC Bulletin Board ("OTCBB") on or about August 2, 2013. NXT-ID began trading on the NASDAQ on September 11, 2014. According to its 2018 Form 10-K, NXT-ID reported total assets of $38,055,564, total liabilities of $21,511,506, an accumulated deficit of stockholders' equity of $50,014,636, revenues of $17,116,511 and a net loss of $7,089,962 for the year ending December 31, 2018, and stated that it intended to retain future earnings to expand its business.

7. Cooperating Witness #1 ("CW-1"), an individual whose identity is known to your affiant, was a United States citizen and resided in Connecticut. From approximately February 2012 to September 2019, CW-1 was an executive officer of NXT-ID.

8. Co-Conspirator #1 ("CC-1"), an individual whose identity is known to your affiant, was a United States citizen. From approximately July 2014 to November 2016,

CC-1 worked with the defendant JEFFREY AUERBACH, and during that time, beginning on or about January 2015, CC-1 was AUERBACH's business partner. On or about November 3, 2016, CC-1 pled guilty to securities fraud, in violation of Title 15, United States Code, Section 78j(b) and 78ff, pursuant to a plea agreement with the government.

9. Cooperating Witness #2 ("CW-2"), an individual whose identity is known to your affiant, was a United States citizen and resided in New York. CW-2 was a registered representative for various broker-dealers between November 1999 and May 2016. Between approximately February 2012 and November 2015, both dates being approximate and inclusive, CW-2 worked at a broker-dealer in Long Island, New York. On August 2, 2016, CW-2 pled guilty to securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, pursuant to a cooperation agreement with the government.[2] Rule 10b-10 of the Exchange Act required that brokers disclose certain information to clients before or at the completion of securities transactions, including the disclosure of the amount of remuneration received or to be received by the brokers in connection with the transactions.

II. The Fraudulent Scheme

10. Between approximately July 2014 and September 2015, the defendant JEFFREY AUERBACH, together with others, conspired to defraud investors and potential investors in NXT-ID by concealing payments to brokers who promoted and sold NXT-ID stock while purporting to be independent of the company. CW-1 and CW-2 indicate that

---

[2] CW-1 and CW-2 are corroborated by other evidence, including text messages, cell-site information, trading records and toll records.

they joined a conspiracy with the defendant and CC-1 to defraud investors and potential investors in NXT-ID's stock. During this time period, CW-1 made undisclosed payments totaling approximately $67,000 to AUERBACH and CC-1, which AUERBACH and CC-1 were directed to pay to CW-2. AUERBACH, CW-1 and CC-1 understood that the payments to CW-2 were so that CW-2 would purchase NXT-ID common stock in CW-2's clients' brokerage accounts. However, neither CW-1, AUERBACH, CC-1 nor CW-2 disclosed to CW-2's clients that CW-1 had secretly paid CW-2 through AUERBACH and CC-1.

11. For example, in or about September 2014, CW-1 paid CW-2 approximately $10,000 to purchase NXT-ID in CW-2's clients' brokerage accounts. CW-1 did not make this payment directly to CW-2. Instead, CW-1 caused NXT-ID to wire funds to CC-1 and CC-1 then paid CW-2. CC-1 told CW-2 that the money was from CW-1 as a kickback for CW-2 purchasing NXT-ID in CW-2's clients' brokerage accounts.

12. In approximately September 2014, CW-1, CC-1 and CW-2 met at Cipriani's restaurant in New York, New York (the "Cipriani Meeting"). During the Cipriani Meeting, CW-1 told CW-2 that, going forward, in exchange for CW-2 purchasing NXT-ID in CW-2's clients' brokerage accounts, CW-1 would compensate CW-2 by paying CW-2 approximately ten percent of the NXT-ID sales proceeds as a kickback in cash.

13. On or about March 3, 2015, at approximately 1:41 p.m., CW-1 emailed the defendant JEFFREY AUERBACH, "Can we get some support today?" On or about March 3, 2015 at approximately 3:59 p.m., CW-2 purchased 5000 shares of NXT-ID.

14. On or about September 17, 2015, CC-1 sent CW-1 an invoice in the amount of $12,000 for a purported "Investor Relations event for brokers and investors." CC-1 then texted CW-1 "invoice sent to you for [CW-2]" and "broker event."

15. On or about September 23, 2015, CW-2 texted CW-1, "was checking status on the FedEx delivery to J."

16. On or about September 24, 2015, CW-1 wired approximately $12,000 from the NXT-ID account to a joint business account held by CC-1 and the defendant JEFFREY AUERBACH.

17. On or about September 28, 2015, the defendant JEFFREY AUERBACH arranged for CW-2 to receive $5,000 in cash from AUERBACH's residence in New York, New York. AUERBACH told CW-2 that the $5,000 was from CW-1. A review of cell-site records from September 28, 2015 shows that the cellular phone associated with CW-2 departed Long Island, New York and was in the vicinity of AUERBACH's residence in New York, New York at approximately 6:11 p.m. A review of CW-2's text messages shows that at approximately 6:11 p.m., CW-2 texted AUERBACH, "Thank you," and at approximately 6:24 p.m., AUERBACH acknowledged CW-2's text message.

18. On or about September 29, 2015, CC-1 disbursed the $12,000 that CW-1 had previously wired to CC-1 and the defendant JEFFREY AUERBACH's joint business bank account on or about September 24, 2015 by issuing a $3,000 check to CC-1 and a $9,000 check to AUERBACH.

19. Between July 9, 2014 and July 29, 2015, CW-2 purchased a total of 321,093 shares of NXT-ID in his clients' accounts at a gross cost of approximately $765,187. Neither Auerbach, CW-1, CC-1 or CW-2 disclosed to CW-2's client that CW-2 was receiving kickbacks for purchasing shares of NXT-ID in CW-2's clients' accounts.

WHEREFORE, your deponent respectfully requests that the defendant JEFFREY AUERBACH be dealt with according to law.

Aristotelis Kougemitros
Special Agent, Federal Bureau of Investigation

Sworn to before me this
2 day of October 2019

s/ Gold

THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK