**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**------------------------------------------------------------- X**

**UNITED STATES OF AMERICA**                    **19 Cr. 607 (PKC)**

                **-against-**

**JEFFREY AUERBACH,**

                **Defendant**

**------------------------------------------------------------- X**


**<u>SENTENCING MEMORANDUM OF JEFFREY AUERBACH</u>**

**SERCARZ & RIOPELLE, LLP**
**950 Third Avenue, 32nd Floor**
**New York, New York 10022**
**Telephone: 212-586-4900**

## PRELIMINARY STATEMENT

Defendant Jeffrey Auerbach ("Mr. Auerbach" or "Auerbach") respectfully submits this memorandum in aid of his sentencing. Although the Presentence Report ("PSR") includes a description of Mr. Auerbach's background and the offense, we submit this memorandum to provide additional detail regarding these matters, so that the Court will have a fully nuanced picture of Mr. Auerbach and his conduct when it imposes sentence on him.

Mr. Auerbach's sentencing presents a series of complex factual issues for the Court to consider. Some of these factual issues require a detailed examination to be fully understood. The level of detail necessary for a full understanding of the relevant issues is simply not possible to include in a PSR. These critical details are elaborated below.

For example, it appears that the government contends that total amount of loss suffered by the victims of this case is approximately $223,564.97, and that many of the victims identified by the government bought their NXT-ID shares in 2014. But Mr. Auerbach did not effectively join the NXT-ID conspiracy charged against him until early 2015, when he became Jared Mitchell's partner in Excelsior Global Advisers. Therefore, he contends that the loss attributable to his co-conspirators' conduct prior to 2015 should not be attributed to him, and the loss chargeable to him is significantly less than the total loss alleged by the government.

Other factual assertions in the PSR do not relate to the calculation of Mr. Auerbach's sentencing guidelines, or even to the crime to which Mr. Auerbach has pleaded guilty. Mr. Auerbach objected to the inclusion of this information in the PSR, but the Probation Department rejected his objections. As a result, these factual issues must be factually rebutted here, even though they are not directly relevant to the calculation of Mr. Auerbach's sentencing guidelines, which are stipulated. The government's factual assertions are intended to influence the Court's

sentence, and, in fairness to Mr. Auerbach, they must be answered. The record must be set straight. We are confident the Court will discount these allegations when it considers the evidence we present.

In addition, Mr. Auerbach's personal circumstances are not fully reflected in the PSR. Mr. Auerbach provided the Probation Department with a selection from a series of letters written to the Court by his family and friends, which describe his character in detail. No reference to these letters of any sort is included in the PSR, so it is incumbent on Mr. Auerbach to amplify the PSR's description of his family, career and relationship to his community.

Mr. Auerbach's family circumstances are quite complex, and the PSR only provides a general sense of the difficulties Mr. Auerbach's family will encounter if he is incarcerated. The facts relating to Mr. Auerbach's family circumstances are essential for the Court's decision on the issue of whether to impose a sentence of incarceration on Mr. Auerbach. The problems Mr. Auerbach and his family will face if he is incarcerated, and the harm that can be avoided by a just sentence that does not include incarceration, are examined in detail below.

Finally, the Court must engage in a detailed and complex consideration of the facts and law in order to determine the financial penalties at issue in this case. Mr. Auerbach has already paid the forfeiture required by his plea agreement in full, so that issue has been resolved, at least as to the correct amount of funds to forfeit. But in fairness to Mr. Auerbach, and the victims of the scheme described in the PSR, the Court should include in its judgment a directive that the Department of Justice apply its restoration policy to Mr. Auerbach's forfeiture payment, so that the funds already paid by Mr. Auerbach will be distributed to the victims, and credited against any restitution payment the Court may impose in this case.

Moreover, as is argued below, it is impossible at this point for the defendant to examine adequately the government's allegations concerning restitution. The government has failed to produce to Mr. Auerbach sufficient information for him to challenge fully the restitution figure -- $233,564.97 – demanded by the government. As we argue below, the Court should schedule a restitution hearing within 90 days of Mr. Auerbach's sentencing, and direct the government to produce the information Mr. Auerbach needs to contest the government's restitution claim before the hearing is held.

For example, Mr. Auerbach has insufficient information concerning the amounts the alleged victims lost on their investment. In some cases, it appears that the victims have not sold their shares, so there is no actual loss at all at this point, only a paper loss, without any credit given for the present value of NXT-ID, or any analysis of the price of NXT-ID during the time the alleged victims have held that stock. The price of NXT-ID has varied significantly since the time the alleged conspiracy ended, and NXT has traded at prices higher than those at which the victims listed by the government bought and sold their shares. Should Auerbach be held accountable for an investor's entire unrealized loss in such circumstances, which appears to be the result of the investor's decision to sell at the wrong time, as much as it is the result of any fraud? Or should Auerbach be held to a smaller figure? Or should he be held no loss figure with respect to holders of NXT-ID stock, since there is no actual loss at this point?

The Court and Mr. Auerbach should also know more about the victim/investors' trading history before the Court imposes an order of restitution here. The Court should know whether the investors bought and sold shares in NXT-ID at a profit before the investments for which the government seeks reimbursement. If the investors/victims were speculators who profited from their speculation, shouldn't their profits be offset against their alleged losses? Did the investors

invest their own money in the shares of NXT-ID, or were those investments bankrolled in part by Richard Brown, Jared Mitchell and/or Gino Pereira? Such arrangements are not unusual in situations like that presented in this case, and if the alleged victims were not the true beneficial owners of the NXT-ID shares held in their accounts, they should not receive any restitution in connection with those shares. Without knowing more about the alleged victims and their alleged losses, and without an opportunity to fully and fairly cross-examine them, we can't really know what the appropriate restitution figure should be. And the Court can't know that either.

We do know that Mr. Auerbach had no contact with any of the victims, and that his role in the fraudulent scheme was minor, and limited. His plea agreement acknowledges as much. We also know that others – Richard Brown, Jared Mitchell and Gino Pereira – have pled guilty to playing far more important roles in the fraudulent scheme than Mr. Auerbach played. But we do not know if they have been ordered to pay any restitution to the victims of their scheme, and if so, we also do not know how much they have paid. No restitution obligation should be imposed on Mr. Auerbach without that information, because it is clear that Brown, Mitchell and Pereira should shoulder far more of the restitution obligation than Mr. Auerbach, given their far more significant role in the fraud charged in this case.

As we argue below, a just sentence is one that permits Mr. Auerbach to continue to support his family, to continue to parent his children, and to continue to be an asset to his friends and his community. His conduct here was aberrant and out of character, and he was neither the architect of nor the principal perpetrator of the fraud for which he stands convicted. There is every reason to believe Mr. Auerbach will be law abiding in the future, just as he has been for most of his life.

For all these reasons, and for the reasons stated more fully below, we respectfully submit that a sentence that imposes a term of home confinement rather than incarceration is appropriate for a first offender in a non-violent felony of the sort at issue here. Such a sentence is entirely consistent with typical sentences imposed in our circuit in similar cases, which often include a modest downward variance from a sentence within the sentencing range recommended by the Sentencing Guidelines. In addition, a sentence that includes a period of home confinement rather than incarceration would be entirely consistent with the American Bar Association's alternative sentencing guidelines, which we urge the Court to consider. And, most importantly, a sentence that leaves Mr. Auerbach the ability to contribute to the support of his family and to parent his children, would be just in every respect.

## STATEMENT OF FACTS

### A. Procedural History

As the PSR notes, Mr. Auerbach was arrested on October 4, 2019, and released on bail the day of his arrest. At the time of his arrest, Mr. Auerbach was charged in the criminal complaint attached as Exhibit A to this sentencing memorandum. The criminal complaint charges Mr. Auerbach with joining a criminal conspiracy to bribe securities brokers to tout the stock of NXT-ID from July 2014 to September 2015, conduct that was four years old at the time of his arrest. The criminal complaint does not allege that Mr. Auerbach acted in furtherance of the conspiracy charged against him until well into 2015, however. See Exhibit A.

Since the time of his arrest and release on bail more than a year ago, Mr. Auerbach has been entirely compliant with the terms of his release. His punctilious adherence to the conditions of his bail demonstrates that he is a good candidate for a sentence that imposes conditions of release on him without a term of incarceration. Mr. Auerbach has demonstrated that he can

conform his conduct to any restrictions the Court may impose, while remaining a productive member of his community, and a husband and father to his family.

Immediately after his arrest, Mr. Auerbach and his counsel began negotiating a possible disposition of this case with the government. After a lengthy and hard fought negotiation, Mr. Auerbach ultimately agreed to plead guilty to a violation of Title 18 U.S.C. Section 371, in connection with his participation in a conspiracy to bribe securities brokers to tout the stock of NXT-ID. A copy of Mr. Auerbach's plea agreement is attached as Exhibit B.

Mr. Auerbach's plea agreement contains a stipulated sentencing guidelines calculation, but it acknowledges that the sentencing guidelines are only advisory, not mandatory. Thus, the plea agreement does not prohibit the Court from imposing a sentence that varies from the stipulated sentencing range, and it permits the parties to argue for a sentence that varies from the stipulated sentencing range. In fact, the plea agreement acknowledges that the Court is not bound by the offense level stipulated to by the parties, and that the Court should consider all relevant facts before imposing a sentence on Mr. Auerbach in accordance with the factors stated in Title 18 U.S.C. § 3553. Exhibit B, p. 2-3.

In the plea agreement, the parties have stipulated that the sentencing guidelines "intended loss" applicable to Mr. Auerbach was in excess of $150,000; that Mr. Auerbach's offense involved 10 or more victims, and that Mr. Auerbach was a "minor participant" in the criminal conduct described in the charge against him, given his limited involvement in the scheme described in the Information. The plea agreement also provides that, in the event Mr. Auerbach enters his guilty plea promptly, he will have accepted responsibility for his crime and should be awarded a three-point reduction in his sentencing guidelines calculation. After that reduction,

Mr. Auerbach's sentencing guidelines offense level is 13, with a recommended sentencing range of 12-18 months. Id.

On January 10, 2020, Mr. Auerbach entered his guilty plea, and allocuted to the crime charged against him. Prior to the entry of Mr. Auerbach's guilty plea, his plea allocution was reviewed and approved by the government. Mr. Auerbach's plea allocution acknowledged that he became partners with his co-conspirator Jared Mitchell in 2015, and that, after that time, he learned that his partner Mr. Mitchell was bribing brokers from time to time "to influence them to buy shares of NXT-ID for their clients." Mr. Auerbach acknowledged that he himself participated in one such bribe transaction in late September 2015, by arranging to pay his co-defendant Richard Brown $5000 in cash. The Court found Mr. Auerbach's allocution adequate to establish his guilt, and both the government and the Probation Department have agreed that Mr. Auerbach's allocution amounts to a full acceptance of his responsibility in this case. See PSR, ¶¶ 25, 35-36.

Subsequent to the entry of his guilty plea, Mr. Auerbach has continued to abide by the terms and conditions of his bail. He met with and was interviewed by the Probation Department, and he has responded fully to the Probation Department's requests for information concerning his career, family, finances and health, providing the Probation Department with hundreds of pages of documentation, and several of the letters of support Mr. Auerbach has received from concerned friends and business colleagues.

On July 14, 2020, the Probation Department disclosed its draft PSR to Mr. Auerbach.[1] On July 23, 2020, Mr. Auerbach timely objected to various aspects of the PSR, providing the Probation Department with additional documentation to support his objections. A copy of Mr.

---

[1] Neither the PSR nor the Addendum are attached to this document because this Sentencing Memorandum will be publicly filed and the PSR and Addendum contain personal information concerning Mr. Auerbach.

Auerbach's objections and additional submissions to the Probation Department is attached as Exhibit C. On October 20, 2020, the government filed a response to Mr. Auerbach's objections, and on October 28, 2020, the Probation Department filed its addendum declining to incorporate Mr. Auerbach's objections into the PSR, but amending the financial disclosures relating to Mr. Auerbach because his financial condition had deteriorated significantly since the first disclosure of the PSR. The government's response to Mr. Auerbach's objections is attached as Exhibit D.

With the disclosure of the final PSR on October 28 2020, this matter is now ready to proceed to sentence.

### B. Mr. Auerbach's Objections to the PSR[2]

The defense does not challenge the stipulated Sentencing Guidelines adjustments applicable to Mr. Auerbach. However, the defense does object to the inclusion of certain facts in the PSR, because those facts are irrelevant to the calculation of Mr. Auerbach's sentencing guidelines. In fairness, Mr. Auerbach presents his objections to these facts so the Court has before it a full record when it imposes its sentence. But most of these objections do not require a Fatico hearing to resolve, since Mr. Auerbach's stipulated sentencing guidelines calculation is not affected by the information sponsored by the government and included in the PSR, nor by the information proffered by the defendant and excluded from the PSR. The only objections to the PSR that require a hearing are Mr. Auerbach's objections to the calculation of his restitution obligation.

---

[2] All of the objections contained in Counsel's letter of July 23, 2020 and attached as Exhibit C are incorporated by reference here.

Mr. Auerbach's objections to the factual assertions in the PSR are as follows.

1. **The Mischaracterization of Mr. Auerbach's Role**

First, Mr. Auerbach objects to the PSR's description of his participation in the conspiracy charged against him, to the extent that description states or implies that he was a knowing and active participant in the conspiracy to bribe securities brokers prior to 2015. As is indicated more fully in Exhibit C, Mr. Auerbach's contracts with NXT-ID and the services he provided to NXT-ID had nothing to do with the conspiracy to bribe securities brokers that is charged in the Information.

As is indicated in the contracts attached to Exhibit C, Mr. Auerbach's role in assisting NXT-ID was always primarily to introduce NXT-ID and its CEO Gino Pereira to potential business partners and customers, including Skymall, Hammacher Schlemmer, Uncommon Goods and Zino Distribution, among others. Mr. Auerbach never introduced Mr. Pereira to any brokers, and never dealt with any broker in connection with NXT-ID's stock until 2015.

Mr. Auerbach and Mr. Mitchell did not become "partners" until early 2015, and even after that time, Mr. Auerbach and Mr. Mitchell had very different roles in their joint venture, Excelsior Global. Mr. Mitchell formed Excelsior Global as a "single member" managed LLC, with himself as the sole member of the Corporation, with full control of its operations. A copy of Excelsior Global's Articles of Organization is attached as Exhibit E. After Mr. Auerbach became Mr. Mitchell's "partner" in Excelsior Global, Mr. Mitchell handled all the banking for Excelsior Global, and maintained complete control of Excelsior Global as its sole member. Mr. Auerbach played no active role in the conspiracy to bribe securities brokers until sometime later in 2015, and the only overt act committed by Mr. Auerbach in furtherance of the conspiracy was

his payment of $5000 in cash to his co-conspirator Richard Brown in late September 2015 at the direction of Mr. Mitchell, as Mr. Auerbach acknowledged in his plea allocution.[3]

Moreover, at Paragraph 12, the PSR misrepresents the events of March 3, 2015, when Mr. Pereira asked Mr. Auerbach to find "support" for NXT-ID's stock by promoting purchases of NXT-ID's stock.  See Exhibit C, p. 3.  As is explained in great detail in Exhibit C to this memorandum, Mr. Auerbach reached out to institutional investors on March 3 in response to the purchase of one of NXT-ID's competitors at a premium.  The purchase of NXT-ID's competitor was a signal that NXT-ID's business model had merit, and that shares of NXT-ID had unrealized value.  In this context, Mr. Auerbach's emails to institutional investors on March 3, 2015 were entirely legitimate attempts to promote NXT-ID's stock, and were not linked in any way to any scheme to bribe securities brokers or manipulate the shares of NXT-ID.[4]  Given the legitimacy of this conduct, we ask the Court to direct the Probation Department to incorporate in the PSR the information concerning these emails that is included in Exhibit C, or strike from the PSR the allegations concerning March 3, 2015 insofar as they relate to Mr. Auerbach.

As is indicated by the foregoing discussion, Mr. Auerbach truly was a "minor participant" in the bribery scheme charged against him, as is stipulated by the government.  His tangential, intermittent and belated knowing participation in the bribery scheme pales in comparison to the participation of his co-conspirators.  The plea agreement negotiated by the

---

[3]  Mr. Auerbach did not have any direct dealings with any broker other than the single payment to Richard Brown described in the Information.  With respect to that payment, the facts are that Mr. Auerbach withdrew from his personal bank account the $5000 that he paid to Richard Brown.  He did not withdraw those funds from Excelsior Global's account, because Jared Mitchell controlled that account, and Mr. Auerbach had no access to that account.  Copies of the Excelsior Global Bank Statements for March 2015 and September 2015 are attached to this Memorandum as Exhibit F.  (These are the two months during which Mr. Auerbach is alleged to have acted to further the conspiracy charged in the Information).  The address for Global Excelsior on these statements, and the address where Global Excelsior's statements were sent, was

.  See Exhibit F.  That is Jared Mitchell's home address.

[4]  After beginning to work directly with Mr. Mitchell, Mr. Auerbach's role at Excelsior /Global consisted primarily of promoting NXT-ID stock to institutions and assisting NXT-ID with a public relations campaign to raise awareness of NXT-ID in the stock market.  The Information does not charge that any statements made during the public relations campaign were false, and Mr. Auerbach and his counsel are not aware of any such allegation.

government acknowledges as much. The Court should require the Probation Department to amend its description of Mr. Auerbach's participation in the scheme to more accurately describe his role, as requested by Mr. Auerbach in Exhibit C, so that the description of Mr. Auerbach's conduct coincides with the downward role adjustment stipulated by the government.

## 2. **The Allegations Concerning Force Field Energy**

Paragraph 19 of the PSR should be stricken. This paragraph contains allegations made by the government concerning Mr. Auerbach's purported connection to time-barred criminal activity in connection with the stock of a company named "Force Field Energy." Force Field is not included in the Information charging Mr. Auerbach with conspiracy, so these allegations are not directly relevant here.

Nine other persons – including Mr. Auerbach's former partner, Mr. Mitchell -- were long ago charged and convicted in connection with a scheme to manipulate the price of Force Field's shares. Mr. Auerbach was not a knowing participant in any scheme to manipulate the price of Force Field's shares, and no charges of any kind were ever lodged against Mr. Auerbach in connection with Force Field. Nor were any claims were ever brought by the SEC against Mr. Auerbach in connection with Force Field, despite the SEC's relatively low burden of proof to bring such claims.

In fact, as is demonstrated in Exhibit C, Mr. Auerbach's association with Force Field Energy was entirely legitimate, and did not involve any contact with brokers, or any attempt by Mr. Auerbach to manipulate Force Field's stock. The government knows this. The government's assertion that it could prove Mr. Auerbach's participation in the Force Field conspiracy "by a preponderance of the evidence" is simply an attempt to besmirch Mr. Auerbach's reputation in the hope of persuading the Court to increase his sentence. The

allegations concerning Mr. Auerbach's purported participation in the Force Field should be stricken from the PSR, and the Court should not consider them, because the government does not have any substantial proof of Mr. Auerbach's alleged wrongdoing in connection with Force Field. If it had such evidence, we are confident the government would have charged Mr. Auerbach at the time it charged Mr. Mitchell and eight others with a scheme to manipulate the price of Force Field's shares.

### 3. The Allegations Concerning Mr. Auerbach's Post-arrest Statements

The inclusion of the government's characterization of Mr. Auerbach's post-arrest statement at paragraph 22 of the PSR should also be stricken, and the Court should not consider paragraph 22 of the PSR when it imposes sentence on Mr. Auerbach. The government has stipulated to a sentencing guidelines calculation that does not include an adjustment for obstruction of justice or a false post-arrest statement, and the government has not charged Mr. Auerbach with making a false statement to a law enforcement officer at the time of his arrest. Nor does the government contend that Mr. Auerbach's post arrest statement is inconsistent with his plea allocution, such that his plea allocution must be perjurious.

The government's version of Mr. Auerbach's post-arrest statement is therefore irrelevant to the calculation of Mr. Auerbach's sentencing guidelines and to determining the extent of his illegal conduct. The government has insisted that Mr. Auerbach's post-arrest statement be included in the PSR to cast aspersions on Mr. Auerbach, in the hope of increasing his sentence beyond that implied by his sentencing guidelines, without charging the defendant with a false statement or insisting on an upward adjustment in Mr. Auerbach's Sentencing Guidelines. The government's attempt to "sand bag" Mr. Auerbach in this way should not influence the Court's

decision here, and the Court should direct the Probation Department to strike the allegations contained in paragraph 22 from the PSR.

### 4. __The Restitution Calculations__

On the issue of calculating restitution, Mr. Auerbach does request that a hearing be held within 90 days of his sentencing, as provided by 18 U.S.C. § 3664. There is no need to delay Mr. Auerbach's sentencing for this purpose, because significant discovery is needed to allow Mr. Auerbach and the Court to address this issue fully; and the statutory framework explicitly allows the Court to impose a sentence on Mr. Auerbach now, while putting off the issue of restitution for another day. Id.

At paragraph 20 of the PSR, the Probation Department lists 25 unidentified victims, who purportedly suffered a total loss of $223,564.97. When the draft PSR was disclosed, Mr. Auerbach's counsel objected to the lack of information contained in this paragraph and demanded full disclosure of the information needed to check and challenge the Probation Department's calculation of restitution. See Exhibit C. Thereafter, the government produced to Mr. Auerbach's counsel the five pages of information attached as Exhibit G to this memorandum. These pages contain no information about the purported victims, and very little information about their trading activity, or what caused them to buy and sell NXT-ID when they did, or their relationship to Richard Brown and/or other members of the conspiracy described in the Information in this case. Nor did the government's disclosure indicate what other co-conspirators had been ordered to pay in restitution in this case, or whether any restitution payments had been made by anyone charged in this case. After receiving and analyzing these additional disclosures, Mr. Auerbach reiterated his objection to the Probation Department's

calculation, listing some of his objections in an email dated October 21, 2020. A copy of this email is attached as Exhibit H.

At this point, the information disclosed by the government raises more questions than it answers. For example, the chart produced by the government appears to indicate that a little more than $150,000 in alleged losses are *unrealized*. That is, it appears that many of the alleged "victims," who bought their shares during the period of the conspiracy charged in the Information, never sold their shares, and continue to hold them. There is no indication in the chart provided by the government to indicate that these "victims" sold their shares at a loss. They have, at this point, suffered no loss whatsoever, and NXT-ID continues to have a residual value and continues to trade. Until the alleged victims whose "losses" are purportedly described in the documents attached as Exhibit H actually sell their shares, they have not suffered any loss, and no restitution is owing as to them.

This is particularly so, because, for *years* after the conspiracy ended, NXT-ID consistently traded at prices above those at which the "victims" bought their shares. It is hard to see how the entire unrealized "loss" allegedly suffered by these victims should be attributed to Mr. Auerbach, when the government concedes that the conspiracy applicable to this case ended in September 2015, and NXT-ID has continued to trade above the value at which the "victims" bought their shares. See Information, p. 1. Nor is it really fair to attribute to Mr. Auerbach the entire loss suffered by those "victims" who did sell their shares at particularly inopportune times, when they could have held their shares and sold them at a profit. With all due respect to these victims, it would be unfair to attribute to Mr. Auerbach the entire amount of their losses.

Attached as Exhibit I is a chart of NXT-ID's share price from 2016 to the present – the time after the alleged conspiracy ended. As the Court can see from this chart, NXT-ID traded as

high as $8 during 2016, and consistently traded over $3, often trading over $5. NXT-ID traded over $5 again at the end of 2017, and did not dip below $3 again until February 2018.

The materials produced by the government indicate that the victims whose losses – realized and unrealized – are calculated and included in the total "loss" of $223,564.97, purchased their shares at prices between a little over $2 and a little over $4 per share. Thus, every victim listed by the government had an opportunity to sell his or her shares at a profit after the conspiracy ended, or at a significantly reduced loss, and failed to do so. While it is fair to attribute to Mr. Auerbach some part of the losses described in the government charts attached as Exhibit G, it is clearly unfair to attribute to him the entire amounts of the losses – particularly unrealized losses – in the circumstances presented here.

Moreover, without complete information about the cost basis for the shares owned by the alleged victims identified by the government, it is impossible to calculate their losses accurately. NXT-ID issued warrants to many of its shareholders, which permitted them to buy shares at a discount. NXT-ID also made private sales of equity at a discount to the market. In each case, the value of the shares acquired at a significant discount would be "marked to market" after the shares were deposited to the victim's account, which would increase the apparent value of the shares. If any of the shares listed in the documents produced by the government to Mr. Auerbach were obtained in these ways, the loss suffered by the holders of these shares would be much less than appears in the government's chart. Mr. Auerbach and the Court cannot know this, however, without further information about the way in which the shares listed in the PSR were obtained. That is why the Court should direct the government to provide full discovery to Mr. Auerbach in connection with the government's restitution claim.

For these reasons, as well as the many others expressed in Mr. Auerbach's written objections to the Probation Department's calculation of the restitution attributable to him (Exhibits C and H), we respectfully respect that the Court proceed by: 1) directing the government to provide further information concerning the alleged losses described in the government's charts, including a full copy of the account records relating to the victims whose losses are included in the government's charts, and complete information concerning any restitution orders entered against Mr. Auerbach's co-defendants to date, and any payments made pursuant to those orders; 2) scheduling a hearing on the restitution issue for approximately 90 days from the day of Mr. Auerbach's sentence; and 3) excluding from the calculation of Mr. Auerbach's restitution obligation any unrealized losses included in the government's charts attached as Exhibit G.

## C. Mr. Auerbach's Personal History, Family Circumstances and Character

### 1. Family Circumstances

Mr. Auerbach is a 50 year old man, who was raised as one of three children in an intact and supportive family. He remains close to all the members of his family, including his brother, sister and elderly parents. See PSR, ¶¶ 45-51. His brother David, a physician in Florida, and his sister, Lesley Pollack, remain close to Mr. Auerbach. Both and have written to the Court on Mr. Auerbach's behalf, to let the Court know of Mr. Auerbach's devotion to his own family and the good works he has done and inspired during his life. Dr. David Auerbach writes:

> … Jeff has been a very devoted husband and father. For the past 22 years, he has always put his wife, Hilary, and their three kids first in anything and everything, they do. He has pushed his daughter, Rayna, academically and has also instilled the importance of giving back to the community. With Jeff's help and guidance, she started a foundation that provides soldiers with PTSD with a companion animal when they return from service.

Letter of Dr. David Auerbach, attached as Exhibit J. Similarly, Lesley Pollack writes of her brother that he "is a kind, warm hearted and extremely generous person," and notes that he has often volunteered to participate in charitable causes. Most importantly, she notes

> Jeff has always been very close to me, my husband and my two children who are now young adults. He has been extremely influential in the lives of my children. He is a great role model to my kids. He has been there day or night to offer his guidance, knowledge and most importantly his friendship to both my son and daughter.
>
> A true family man is a way to describe Jeff. He is a great husband and father that has been more involved with his children than most dads ever get the opportunity to do.

Letter of Lesley Pollack, attached as Exhibit K. Ms. Pollack's husband Steven also writes the Court to describe how Mr. Auerbach came to his aid at a difficult time, helping him to make it through the devastating loss of his company by offering advice and help when he needed it most. As Mr. Pollack notes,

> I am not downplaying the severity of the crime that [Mr. Auerbach] pled guilty to, but I know Jeff as well as anyone ….
>
> In my entire personal life and business career, I have never met a perfect person as we both know that doesn't exist, but my brother is a great guy, that made a mistake. In no way, shape or form am I trying to minimize that mistake he made. However I know that he will become an even better person, because of it, if that is possible and will carry with him all the responsibility of making that mistake for the rest of his life.

Letter of Steven Pollack, attached as Exhibit L.

Mr. Auerbach's devotion to his children is particularly significant, and is mentioned by many of those who have written to the Court. And his devotion to his children is particularly important in the case of his family. As the PSR notes, Mr. Auerbach's son Harlan has Asperger's Syndrome and other psychological disorders, and his son Rhys suffers from

Attention-Deficit/Hyperactivity Disorder and other psychological conditions. See PSR, ¶ 49. Medical records describing the psychological conditions of Harlan and Rhys are attached together as Exhibit M. Mr. Auerbach's contribution to the difficult job of parenting his sons and their sister in these circumstances is critical to his nuclear family's continued wellbeing.

Mr. Auerbach's devotion to the care of his son Harlan is described at great length in the letters written by Harlan's treating psychologist, Michael Fraser, Ph.D. These letters are attached together to this Memorandum as Exhibit N. In his letter of January 16, 2020, Dr. Fraser states that

> … in over twenty-five years of providing family therapy, Jeff has been the most dedicated father with whom I have ever worked. … Week after week, Jeff arrived with Hillary, rolled their sleeves up, and worked hard to do what was needed to help their son. … Jeff has been highly engaged and involved, and his son has shown improvement over this time in large part because Jeff has been there every step of the way.
> …
> It would be clinically irresponsible of me not to mention that Jeff's son needs his father now more than ever and that it would be an extreme hardship for him to lose his father at this time in his life.
> …
> Jeff continues to be an integral part of his son's treatment with me (we still meet weekly). I fear that, without Jeff at home – especially in light of the myriad issues autistic children face during adolescence – his son would deteriorate significantly. If Jeff had to serve time outside his home, his departure would be extremely detrimental not only to his son, but to his other two children, as well as to Hilary, who has also invested so much time and energy in our treatment.

And, in his October 9, 2020 letter updating his report, Dr. Fraser writes

> … Jeff's son's diagnosis requires, in my clinical opinion, that both his mother and father work together as a team to manage his behaviors at home. Just this past month, we have struggled with several behavioral issues that Jeff and Hilary were able to manage as a parent team, supporting each other to help their son. His behaviors can escalate such that, without Jeff's presence to assist Hilary (and vice versa), he would be at great risk for being out of

> control both emotionally and behaviorally. … If Jeff were not in
> the home to practice this team approach with Hilary, their son's
> treatment would suffer, and my fear is that his behaviors would
> escalate such that he would suffer tremendously and, moreover,
> Hilary and his two siblings would experience undue hardship.

Letter of Dr. Michael Fraser, attached as Exhibit N.

Mr. Auerbach and his extended family are also struggling to deal with his parents' health problems.   As the PSR notes, Mr. Auerbach's father, Jerome Auerbach, suffers from serious heart disease and prostate cancer at 83 years of age.  PSR, ¶ 45.  Mr. Auerbach's mother, Rita Auerbach, suffers from stage four colon cancer.  Id.  Mr. Auerbach contributes as much as he can to the care of his parents, and recently traveled to Florida to see and help care for his mother as she recovered from a medical procedure.  Unfortunately, the defendant's ability to travel to see his parents regularly has been curtailed by the Covid 19 pandemic, but he remains in close contact with them, and with his brother regarding their care.  If he is incarcerated, Mr. Auerbach will not be able to provide the support for his parents that he is providing now.

### 2.  Business Career

Mr. Auerbach's generosity of spirit has also been a feature of his long and successful business career.  The PSR notes that Mr. Auerbach has been employed in the securities industry for more than 20 years.  PSR, ¶ 57.  During his lengthy career in the securities industry, Mr. Auerbach has had only two minor customer complaints, and agreed to accept a single, 90 day suspension of his license to settle a technical, regulatory dispute without any admission of guilt. Id.  This case is Mr. Auerbach's first serious brush with the law after working for many years in a highly regulated environment.  Until now, no regulator or prosecutor has alleged that Mr. Auerbach was a knowing participant in any criminal or fraudulent conduct.  Mr. Auerbach has no prior criminal history.  PSR, ¶¶ 38-39.

The letters written by Mr. Auerbach's business associates are entirely consistent with his employment history as reported in the PSR. For example, Mr. Auerbach's colleague Paul Danner goes to great lengths to describe Mr. Auerbach's commitment to Mr. Danner and his company, seeing them through a very difficult period despite the financial difficulties Mr. Auerbach faced. Mr. Danner writes:

> … even through those grim times, as Jeff watched the value of his warrants diminish on a daily basis, and without any further remuneration, he continued to dispense constructive advice and provide compassionate encouragement – most definitely not behavior typically displayed by those who earn their living on Wall Street.

Letter of Paul Danner, attached as Exhibit O. These types of sentiments are echoed by many of Mr. Auerbach's business connections, including Darren Bankston, who writes that he has worked with Mr. Auerbach on several projects over the last five years, noting that the "livelihood and well-being of [many] people and their families is a direct result of Jeff and his work ethic." Mr. Bankston continues, "Jeff has always been generous with his time, knowledge and personal knowledge of individuals to refer and introduce to meet one's goals…" resulting in "a relationship that for me exceeded the service provider, vendor relationship to the point I consider him a dear friend." Letter of Darren Bankston, attached at Exhibit P. Similar letters from other business associates, Justin Mendoza, Paul Vassilakos, Jeffrey Hart, and Ross Carmel, are attached to this Memorandum together as Exhibit Q.

### 3. Religious Community and Community at Large

Mr. Auerbach is a well-respected and active member of his religious community, and Rabbi David Gelfand has written the Court to describe Mr. Auerbach's activities as a member of Temple Israel, assisting his synagogue "to respond to global hunger" and taking "a leadership role in creating various programs, social/cultural/religious, for his age cohort that have been

warmly received by scores of people."  Rabbi Gelfand notes that he has "witnessed and heard from many of [Mr. Auerbach's] warmth, friendship, loyalty and readiness to be understanding of others and always inclusive."  Letter of Rabbi David Gelfand, attached as Exhibit R.

Mr. Auerbach's fundamental kindness and decency is echoed in letter of his friend Gordon Golub, who comments

> I have many colleagues and friends that know Jeff well.  Anytime Jeff's name comes up it is always with the utmost respect.  People often comment on how he goes out of his way to help others and be there for them.  In addition, people regularly speak of his integrity, honesty and professionalism.  Jeff's smile with children is on full display every day and he has made a positive impact on so many kids in our community.

Letter of Gordon Golub, attached as Exhibit S.

In short, Mr. Auerbach's conduct in this case is an aberration.  His life has been admirable and productive.  He has been a devoted son, a good husband, and a committed father.  He has been a successful business person, whose success has come partly from his hard work, but also from his generous commitment to his colleagues' success.  He has consistently been active in his religious community, to the benefit of many.  But for his deplorable conduct here, his life to date has been admirable.  His family, his business associates and his community will all benefit from his continued presence.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD IMPOSE
A SENTENCE THAT DOES NOT INCLUDE
IMPRISONMENT**

The Courts have frequently noted that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense." United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008). At least one judge in the Southern District has frequently lamented "the utter travesty of justice that sometimes results from the guidelines fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.) For this reason, it is frequently the case that the Courts throughout the Federal Judicial system depart substantially from the applicable sentencing guidelines in fraud cases like this one, and impose sentences substantially below the sentencing range dictated by a strict guidelines analysis. See, e.g., USSC Quick Facts, Theft, Property Destruction, and Fraud Offenses, p. 2, attached as Exhibit T (more than one third of all federal property crimes receive sentences below the applicable sentencing guidelines range).

In fact, in our Circuit in 2019, only about 26% of all of the 535 fraud/theft/embezzlement cases were sentenced within the applicable sentencing range set by the Sentencing Guidelines. No case received a sentence that departed upward from the sentencing range; 17% of the cases received a downward departure for 5K1.1 cooperation; approximately 3% of the cases received a downward departure for other reasons; and **54%** of the fraud/theft/embezzlement cases received a sentence that varied from the sentencing range set by the Sentencing Guidelines, the overwhelming majority of which were downward variances. See USSG Statistical Information

Packet, Fiscal Year 2019, Second Circuit, pp. 12, 16 (tables 8 and 10), attached as Exhibit U. Thus, even after excluding downward departures for cooperation from this analysis, it appears that approximately half of all fraud/theft/embezzlement cases received a sentence that departed or varied downward from the sentencing range recommended by the Sentencing Guidelines.

Over the past several years, Courts in our Circuit and elsewhere have begun to look for measures of culpability that are different from the Sentencing Guidelines, which frequently appear to call for sentences that are perceived as excessive. In looking for alternatives to the Federal Sentencing Guidelines, the Courts have often looked to the sentencing guidelines contained in the Report of the American Bar Association's Task Force on the Reform of Federal Sentencing for Economic Crimes (the "ABA Guidelines"). And, in many cases, Courts have adopted the measures of culpability recommended by the ABA Guidelines, after comparing the ABA Guidelines to the Federal Sentencing Guidelines. See Anello and Albert, "Rise of the ABA Task Force's 'Shadow Sentencing Guidelines,'" New York Law Journal, Volume 255, No. 64 (2016) attached as Exhibit V.

In this case, we urge the Court to consider the ABA Guidelines when it decides the sentence it will impose on Mr. Auerbach. To aid the Court, a copy of the ABA Guidelines is attached as Exhibit W.

We respectfully submit that the ABA Guidelines suggest that a modest downward variance in Mr. Auerbach's Federal Sentencing Guidelines sentencing range is appropriate, because the ABA Guidelines would not provide for a term of incarceration in this case. The ABA Guidelines focus on the "actual loss" inflicted by the defendant's conduct rather than "intended" loss (approximately $71,000, not the $223,000 in "restitution" sought by the government). They focus on how much of that loss the defendant himself earned from the

wrongful conduct (in this case, the $33,500 already forfeited by Mr. Auerbach, which is less than half the actual loss attributed to his conduct).  The ABA Guidelines also focus on the relative culpability of the defendant as compared to his co-defendants (the government acknowledges that Mr. Auerbach's culpability is relatively low compared to his alleged co-conspirators – it agrees that he is a "minor participant" in the crime charged).  And, most importantly, the ABA Guidelines give strong weight to the consideration of probationary sentences for first offenses like Mr. Auerbach's.  See Exhibit W, pp. 6-7.

We respectfully submit that the ABA Guidelines' recommendation of a sentence in this case that does not include incarceration is a good one, and we urge the Court to impose such a sentence.

## POINT II

### THE FACTORS DESCRIBED IN
### TITLE 18 U.S.C. SECTION 3553(a)(2)
### WEIGH IN FAVOR OF
### A NON-GUIDELINES SENTENCE
### THAT DOES NOT INCLUDE INCARCERATION

Title 18 U.S.C. § 3553 provides that the Court should impose "a sentence sufficient but not greater than necessary" to provide just punishment for the defendant, and requires the Court to consider "the nature and circumstances of the offense and history and characteristics of the defendant."   Pursuant to 18 U.S.C. § 3553, the Court must also consider the need for the sentence it imposes "to reflect the seriousness of the offense, [and] to promote respect for the law."  18 U.S.C. § 3553(a)(1) and (2)(A).  These sections of the Code direct the Court to consider the defendant and his actions holistically, and to "provide just punishment for the offense" in light of all the facts known to the Court.

While Mr. Auerbach's offense is very serious, there is no question that a substantial sentence of home detention is a serious one.  Compare Gall v. United States, 128 S. Ct. 586, 595-96 (2007) (a probationary sentence imposes a significant restraint on the liberty of a defendant).  Furthermore, such a sentence will promote respect for the law and provide just punishment in this case, because such a sentence will provide the defendant with the ability to continue to provide emotional and financial support for his family, while significantly restricting his liberty.

In the present case, we respectfully submit that, after a measured and thoughtful consideration of all the relevant facts, the Court should sentence Mr. Auerbach to a term of home confinement for a year, followed by a three year term of supervised release.  We submit that this sentence is certainly severe enough to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In fact, no one could characterize such a sentence as a "slap on the wrist."

A sentence of this kind will allow Mr. Auerbach to continue to support his family financially, because he will be able to continue to work while confined to his home.  It will of course be a struggle for Mr. Auerbach to maintain full time employment while confined to his home, but if he is incarcerated, any income Mr. Auerbach might earn will vanish during the term of his incarceration.

Mr. Auerbach's importance to his family unit, which would surely struggle to survive without him, is a factor the Court should take into account when it considers "the … history and characteristics of the defendant."  In the days when the sentencing guidelines were binding on the Court, factors such as Mr. Auerbach's importance to his son Harlan's treatment, and to his family unit generally, would justify a departure from the applicable sentencing range. See, e.g., United States v. Londono, 76 F.3d 33, 36 (2d Cir. 1996) ("this Court and other courts of appeals

have recognized that a defendant's familial responsibilities may present such 'extraordinary circumstances' that a downward departure in sentencing is necessary and permissible"); United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992) (same). Now that the sentencing guidelines are only advisory, the reasoning of these cases supports a non-guidelines sentence that includes a modest downward variance to a sentence of home detention. Mr. Auerbach submits that he should receive a non-guidelines sentence of a year of home detention, based on his family circumstances as described in the letters and medical records attached to this memorandum. See United States v. Galante, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding sentencing court's decision to depart downward based upon the Judge's determination that "removal of the father from this unit at this particular point in time would have a disastrous effect on the children in terms of possibilities of their education and upbringing"); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding downward departure where defendant's incarceration in accordance with the Guidelines "might well result in the destruction of an otherwise strong family unit").

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This factor focuses on general deterrence of the public from committing criminal conduct of the type the defendant has engaged in.

With respect to general deterrence, Mr. Auerbach submits that a sentence of home detention, together with the significant forfeiture he has already paid,[5] and any restitution payment that the Court may compel him to pay in the future, will provide good *general* deterrence to future criminal conduct of others, as required by Section 3553(a)(2)(B), to the extent such deterrence can be effective. If the Court imposes the sentence Mr. Auerbach suggests, Mr. Auerbach will be a convicted felon; he will serve a significant term of home

---

[5] A copy of Mr. Auerbach's payment of his forfeiture obligation in full is attached as Exhibit X.

detention, at a serious opportunity cost to his employability; he will his have repaid his victims every penny he gained from his offense, and he will be compelled to pay his victims all or part of their losses from his offense.  No one hearing of Mr. Auerbach's sentence could fairly describe it as inappropriately "soft on crime."

In this regard, the Court should be aware that the effectiveness of harsh sentences as "general deterrents" is questionable.  Social science appears to undermine the notion that lengthy sentences will deter others from committing similar crimes.  Social scientists have noted that "potential criminals . . . do not believe [that] they will be apprehended and convicted," and therefore they do not "consider sentence consequences in the matter one might expect of rational decision makers." Amy Baron-Evans, Sentencing by the Statute, 7-9 (Apr. 27, 2009, revised Dec. 21, 2010), http://www.fd.org/docs/select-topics/sentencing-resources/sentencing-by-the-statute.pdf?sfvrsn=4 (citing Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)).  "[R]esearch on the personality of known offenders portrays them as impulsive, impatient, easily distracted, narrowly focused on the short-term consequences of their actions and biased towards behaviors that are immediately gratifying, regardless of the long-term risks." Gary Kleck et al., The Missing Link in General Deterrence Research, 43 CRIMINOLOGY 637 (2005).

Empirical evidence demonstrates that actual punishment levels, measured in terms of certainty, severity, and celerity, have no effect on perceived punishment levels on the part of criminals and non-criminals alike. Id., at 644, 647, 650.  Although the "punishment-generating activities of the criminal justice system" may produce some "baseline deterrence effect," there is no indication that deterrence is influenced by either an increase or a decrease in punishment levels. Id., at 653; see also Raymond Paternoster, How Much Do We Really Know About

Criminal Deterrence? 100 J. Crim. L. & Criminology 765, 804-05, (2010). Because there is no

evidence to suggest that sentencing Mr. Auerbach to a more severe punishment will lead to a

reduction of crime through general deterrence mechanisms, and there *is* evidence to suggest that

no deterrent effects will be lost if Mr. Auerbach is sentenced to a term of home confinement,

consideration of 18 U.S.C. § 3553(a)(2)(B) weighs against imposing a term of imprisonment.

See Kleck at 655. For these reasons as well, we respectfully submit that the 12-18 month term of

incarceration recommended by the Sentencing Guidelines is not necessary to promote general

deterrence of the sort contemplated by 18 U.S.C. § 3553(a)(2). In this case, a 12 month term of

home confinement can be just as effective in doing so.

The third factor listed in 18 U.S.C. § 3553 (a)(2)(C) focuses on specific deterrence of

further criminal conduct by the defendant himself. It requires to the Court to consider the need

"to protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(C). If the

Court imposes a 12 month term of home confinement on Mr. Auerbach, followed by a three year

term of supervised release, such a sentence will certainly provide good *specific* deterrence to

prevent Mr. Auerbach from committing any further crimes, because he will be monitored by a

probation officer for an extended period, and will therefore have little opportunity to engage in

further criminality.

Moreover, Mr. Auerbach's personal history and characteristics as set forth above and in

the PSR indicate that there is little chance that Mr. Auerbach will commit additional crimes. Mr.

Auerbach is a first-time offender with zero criminal history points and no prior arrests and "[t]he

empirical evidence shows that criminal history as a risk measurement tool has statistically

significant power in distinguishing between recidivists and non-recidivists." USSC, *Measuring

Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 15 (May

2004). Data collected and analyzed by the United States Sentencing Commission for its comprehensive 2003 recidivism study shows that the reconviction recidivism rate for defendants with zero criminal history points and no prior arrests is only 2.5%, and the primary recidivism rate – including re-arrest and supervised release and probation violations – is 6.8%. USSC, *Recidivism and the First Offender*, 26 (May 2004). This compares to 3.5% reconviction and 11.7% primary recidivism rates for all defendants with zero criminal history points, *Recidivism and the First Offender* at 26, and 4% reconviction and 13.8% primary recidivism rates for all Criminal History Category ("CHC") I defendants. *Measuring Recidivism* at 21. By way of contrast, the reconviction and primary recidivism rates for all criminal defendants are 6.3% and 22.1% respectively. *Id.* Mr. Auerbach's risk of recidivism is further reduced as compared to all other defendants because, in the year prior to the instant arrest, he was employed[6] and did not abuse drugs.[7] *Id.* at 28-29.

The single most important factor to take into consideration, however, in determining that Mr. Auerbach is unlikely to engage in additional criminal conduct is his genuine and profound remorse, and the support he finds in those who are near to him. Mr. Auerbach is truly sorry for the wrong that he has done, and for letting down his immediate family, his extended family, his friends and his community. As his friend and colleague, Darren Bankston puts it, a recent "holiday dinner" "was an enjoyable event but as the conversation revolved around family and life it was apparent the remorse and emotional strain this case was having on not only Jeff but his entire family …. I am confident the remorse Jeff has is genuine. I believe in his devotion to his family, and I am confident he is pursuing the right path in his professional and personal life." Letter of Darren Bankston, Exhibit P.

---

[6] Primary recidivism rate for CHC I defendants is 12.7%.
[7] Primary recidivism rate for CHC I defendants is 10.8%.

18 U.S.C § 3553(a)(2)(D) speaks of the need for a sentence to "provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." We respectfully submit that a term of incarceration is not needed to provide Mr. Auerbach with education or vocational training – he is a successful business executive, and he does not need "educational or vocational training" supplied by the BOP. Instead, Mr. Auerbach needs to get back to work as promptly as possible, to feed his family and to assist his wife in raising their children.

Nor is a term of incarceration necessary to ensure that Mr. Auerbach will receive necessary medical care. Quite the contrary. Prisons and jails have become far more dangerous places during the Covid 19 pandemic, because the virus spreads easily when individuals are confined in a dense area such as a prison. On November 14, 2020, the BOP Website reports that 19,702 inmates have had positive tests for Covid 19 while in BOP custody. See BOP.gov. The Washington Post recently reported on the rampant spread of Covid 19 through various prison systems, and the devastating results for those confined in the prison system, and just yesterday, the New York Times published an op-ed decrying the spread of the Covid 19 Pandemic in our prison system. See "Prisons and Jails Have Become a 'Public Health Threat' During the Pandemic, Advocates Say," The Washington Post, November 11, 2020, and "America Is Letting the Coronavirus Rage Through Prisons," New York Times, November 22, 2020, copies of which are attached together as Exhibit Y. Mr. Auerbach, who suffers from asthma, is at serious risk of fatality if he were to contract Covid 19 while incarcerated. Given this fact, Mr. Auerbach would be a strong candidate for transfer to home confinement pursuant to the Attorney General's March 26, 2020 Memorandum, which recommends transfer to home confinement for persons such as

Mr. Auerbach. A copy of the Attorney General's March 26, 2020 Memorandum is attached as Exhibit Z.

The severe risk of infection and fatality for Mr. Auerbach is a very good reason to impose a sentence that varies modestly from the term of incarceration recommended by the Sentencing Guidelines, to impose a similar sentence of home confinement. Indeed, such a sentence will allow Mr. Auerbach to have greater contact with specialists and other physicians than the Bureau of Prisons can reasonably be expected to provide, if, God forbid, he should need them as a result of a Covid 19 infection. Thus, an analysis of this factor also suggests that a sentence of incarceration is unnecessary and would be counterproductive.

18 U.S.C. § 3553(a)(6) requires the Court to consider whether the sentence it imposes will result in an "unwarranted sentencing disparity." In this case, imposing a significant term of home confinement followed by a three year term of supervised release on Mr. Auerbach will not result in an "unwarranted sentence disparity" as compared with the sentences imposed on similarly situated "white collar" defendants generally. See 18 U.S.C. § 3553(a)(6). As is noted above, a modest downward variance from the Sentencing Guidelines is fairly common in cases like this one. Mr. Auerbach respectfully submits that the sentence he proposes is an appropriate one, which will harmonize with other sentences imposed in similar fraud cases, as reported by the Sentencing Commission. See Exhibits T and U (downward variances common in fraud and theft cases).

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense." As is indicated above, Mr. Auerbach stands ready to pay restitution, after a full and fair hearing has been held on the correct amount of restitution to impose on Mr. Auerbach. A sentence of home confinement is clearly an appropriate sentence in

this case, because it increases the likelihood that Mr. Auerbach will be able to pay restitution. Such a sentence will give Mr. Auerbach the best opportunity to continue working and earning the amounts he will need to pay any restitution imposed by the Court. And keeping Mr. Auerbach incarcerated for a lengthy period would only make it less likely that he could contribute to the payment of restitution to the victims of the fraud.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a sentence that combines a lengthy term of home detention with a full three year term of supervised release in this case.

## POINT III

## ISSUES THAT CONCERN FINANCIAL PENALTIES
## TO BE IMPOSED ON MR. AUERBACH

Mr. Auerbach has already paid in full an amount that the government has calculated to be the correct forfeiture amount in this case.  <u>See</u> Exhibit .  To reflect this payment, the defendant requests that the Court include a notation that the defendant has paid his forfeiture obligation in full in its Criminal Judgment in this matter, and direct the government to file a Satisfaction of Judgment in connection with that payment.

In addition, Mr. Auerbach requests that the Court direct the government to distribute his forfeiture payment to the victims of his crime, pursuant to the DOJ's "Restoration Policy."  In the absence of such a directive, the $33,500 already paid by Mr. Auerbach in forfeiture may never be distributed to those who were victimized by his crime.

Mr. Auerbach also requests that the Court set a date for a hearing to determine his restitution obligation.  Prior to that hearing, the government should be compelled to produce the discovery Mr. Auerbach needs to conduct such a hearing – including complete account information for each of the unidentified victims described in the PSR, and a record of any previous restitution payments made by others – so that a fair determination of Mr. Auerbach's liability for restitution can be made.

Mr. Auerbach respectfully requests that the Court waive any fine in this case, in light of the fact that he has already paid a substantial forfeiture, and will likely be required to pay an additional amount in restitution in this case.  And Mr. Auerbach respectfully requests that the Court waive interest on any financial penalty imposed on him.

## <u>CONCLUSION</u>

For all the foregoing reasons, Jeffrey Auerbach respectfully requests that the Court

impose a sentence on him that is just, and he contends that such a sentence would include a term

of 12 months of home confinement in lieu of incarceration in this case.

Dated:  New York, New York
         November 20, 2020

                                    SERCARZ & RIOPELLE, LLP

                                    *Roland G. Riopelle*

                    By:     _____
                                    Roland G. Riopelle, Esq. (RR-2950)
                                    950 Third Avenue, 32nd Floor
                                    New York, NY  10022
                                    (212) 586-4900
                                    Fax: (212) 586-1234

                                    *Attorneys for Defendant Jeffrey Auerbach*