

U.S. Department of Justice

United States Attorney
Eastern District of New York

MEB/HDM
F. #2016R01176

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 1, 2020

**By Hand and ECF**

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Jeffrey Auerbach
                 Criminal Docket No. 19 CR 607 (PKC)

Dear Judge Chen:

        The government respectfully submits this letter in advance of the defendant Jeffrey Auerbach's sentencing hearing, scheduled for December 7, 2020, and in response to the defendant's November 23, 2020 sentencing submission ("Def. Mem."; ECF No. 37). The government agrees with the calculation of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range set out by the Department of Probation ("Probation") in the July 14, 2020 Presentence Investigation Report ("PSR"). The defendant knowingly and willfully engaged in a conspiracy to defraud investors and potential investors by concealing kickback payments to brokers who promoted and sold NXT-ID stock while purporting to be independent of the company. (PSR ¶ 10). The scheme resulted in losses to victims totaling more than two hundred and twenty thousand dollars, while the defendant received payments for his role facilitating kickbacks to a corrupt broker. (PSR ¶ 18). For the reasons set forth below, the government submits that a term of imprisonment within the applicable Guidelines' range of 12-18 months imprisonment as calculated by Probation is appropriate. (PSR ¶ 74). The government further requests that the Court order the defendant to pay an apportioned amount of restitution in the amount of 50% of the $223,564.97 in victim losses (PSR ¶ 83), or $111,782.49, to the twenty-five victims of the scheme, jointly and severally with separately convicted CW-1.[1]

---

[1] As set out in the plea agreement and Order of Forfeiture, the defendant agreed to forfeit $33,500. (Plea Agreement ¶¶ 6-13; ECF No. 29; PSR ¶ 85). The forfeiture amount was paid by the defendant on March 10, 2020. (PSR ¶ 85).

I. <u>Offense Conduct</u>

On February 24, 2020, the defendant pled guilty pursuant to a plea agreement to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, as charged in a one count Information. (PSR ¶ 1; Plea Agreement ¶ 1; ECF No. 23). The charge stemmed from the defendant's involvement in a scheme, between approximately July 2014 and September 2015, to deceive victims who resided in the Eastern District of New York and elsewhere, in connection with the purchase and sale of investments in NXT-ID. (PSR ¶ 1).

Cooperating Witness #1 ("CW-1") was an executive officer of NXT-ID from approximately February 2012 to September 2019. (ECF No. 1 ¶ 7).

Co-Conspirator #1 ("CC-1") worked with the defendant from approximately July 2014 to November 2016 and was his business partner during that time beginning on or about January 2015. (ECF No. 1 ¶ 8). On or about November 3, 2016, CC-1 pled guilty to securities fraud in violation of Title 15, United States Code, Section 78j(b) and 78ff, pursuant to a plea agreement with the government. (<u>Id.</u>)

Cooperating Witness #2 ("CW-2") was a registered representative for various broker-dealers between November 1999 and May 2016. (ECF No. 1 ¶ 9). Between approximately February 2012 and November 2015, both dates being approximate and inclusive, CW-2 worked at a broker-dealer in Long Island, New York. (<u>Id.</u>). On August 2, 2016, CW-2 pled guilty to securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, pursuant to a cooperation agreement with the government. (<u>Id.</u>).

As a broker, CW-2 promoted NXT-ID stock and purchased 321,093 shares at a gross cost of approximately $765,187 using funds in his clients' investment accounts while simultaneously receiving kickbacks for these purchases. (PSR ¶¶ 10, 22; ECF No. 1 ¶ 19). The defendant and CC-1 facilitated these kickbacks by concealing payments made between CW-1 and CW-2. (PSR ¶ 10) CW-2 purported to be independent of the Company, and thus CW-2's clients were not aware of the payments. (PSR ¶ 10). Over the course of the scheme, CW-1 paid $67,000 to the defendant and CC-1 to compensate CW-2 for purchasing the company's stock in the accounts of his brokerage clients. (<u>Id.</u>).

The defendant's criminal scheme was predicated on CW-2's access to and control of his clients' brokerage accounts. As a co-conspirator of the defendant, CW-2 executed purchases of NXT-ID shares on behalf of his clients to promote sales of NXT-ID stock and maintain a liquid market for the shares. (PSR ¶ 25). Then, to conceal and provide a false sense of legitimacy for the payments involved in the fraud scheme, CW-1 entered into "consulting agreements" with companies owned jointly by the defendant and CC-1. (PSR ¶ 18). After receiving payments from NXT-ID, the defendant and CC-1 funneled a portion of these funds to CW-2 as kickbacks for purchasing additional shares of NXT-ID through his clients' accounts. (<u>Id.</u>). The NXT-ID stock purchases made by CW-2 resulted in actual losses to victims in the amount of $223,564.97. (<u>Id.</u>).

2

A. <u>The Defendant's Participation in the Scheme</u>

The government's evidence, including the defendant's communications with his co-conspirators, make plain that he was integrally involved in the scheme, and helped pay kickbacks to CW-2 in return for the NXT-ID stock purchases made. While CW-1 paid the kickbacks and CW-2 executed the fraudulent stock purchases, the defendant played a key role as the middleman, facilitating the kickback payments from CW-1 to CW-2. (PSR ¶ 23).

In September 2014, the defendant's business partner, CC-1, received $10,000 from CW-1, which he paid to CW-2 as a kickback for purchasing NXT-ID shares. (PSR ¶ 11). CC-1 told CW-2 that the payment was a kickback for purchasing NXT-ID stock in his clients' brokerage accounts. (<u>Id.</u>). Later, the defendant and co-conspirators met at Cipriani's restaurant in Manhattan where it was agreed that the CW-1 would pay CW-2 ten percent of future share purchases as a kickback in cash. (<u>Id.</u>).

On March 3, 2015, CW-1 emailed the defendant, "Can we get some support today?" (PSR ¶ 12). The defendant understood this to mean that CW-1 was asking to see if defendant could find someone to purchase NXT-ID's stock. (<u>Id.</u> ¶ 22). The same day CW-2 purchased 5,000 shares of NXT-ID. (<u>Id.</u> ¶ 12). On September 17, 2015, CC-1 sent CW-1 a $12,000 invoice for a purported "Investor Relations event for brokers and investors." (<u>Id.</u> ¶ 13). CC-1 then texted CW-1 "invoice sent to you for [CW-2]" and "broker event." (<u>Id.</u>). On September 23, 2015, CW-2 texted CW-1, "was checking status on the FedEx delivery to J." (<u>Id.</u> ¶ 14). The following day, on September 24, 2015, CW-1 wired approximately $12,000 from an NXT-ID account to a joint business account held by defendant and CC-1. (<u>Id.</u> ¶ 15). On September 28, 2015, defendant withdrew $5,000 in cash from a personal bank account and delivered it to CW-2 at the instruction of his business partner, CC-1. (<u>Id.</u> ¶¶ 16, 25). Defendant knew that the money was a bribe for purchases of NXT-ID stock and was later reimbursed by CC-1. (<u>Id.</u> ¶ 25). On September 29, 2015, CC-1 disbursed the $12,000 that had been received from CW-1 five days prior, issuing a $3,000 check to CC-1 and a $9,000 check to the defendant. (<u>Id.</u> ¶ 17).

B. <u>The Defendant's Arrest</u>

The defendant was arrested on October 4, 2019 at his home in Manhattan, New York, pursuant to an arrest warrant and a complaint charging him with conspiracy to commit securities fraud. (PSR ¶ 22; ECF No. 1). The complaint provided detailed information regarding the securities fraud conspiracy, including the information summarized above. (ECF No. 1) The scheme resulted in losses to twenty-five victims, totaling $223,564.97. (PSR ¶ 25). The defendant waived indictment and pled guilty to an Information in the Eastern District of New York on February 24, 2020 (Plea Agreement; PSR ¶ 1).

C. <u>The Defendant's Involvement in ForceField Scheme</u>

While not charged, the defendant also participated in another stock manipulation and undisclosed promotion scheme. In the criminal case <u>United States v. Mitchell, et al.</u>, 16-CR-234, before the Honorable Brian M. Cogan, Jared Mitchell, Richard Brown, Christopher F. Castaldo, Gerald Cocuzzo, Naveed Khan, Herschel C. Knippa III, Maroof Miyana, Pranav Patel,

and Louis F. Petrossi were charged and all convicted in connection with a scheme to defraud investors in ForceField Energy, Inc. ("ForceField"), which was listed on the NASDAQ under the ticker symbol FNRG. (PSR ¶ 19). In that case, ForceField's CEO, separately convicted Richard St Julien, used an offshore bank account in Belize in the name of the corporation Adventure Overseas Holding Corporation ("AOHC") and an attorney escrow account to make secret kickback payments to stock promoters and stock brokers so that the stock brokers would purchase stock on their clients' behalf. The defendant's business partner, CC-1, was convicted in that scheme, as was the corrupt stock broker involved in this scheme, CW-2.

The defendant was involved in the ForceField stock fraud scheme, because, among other things: (1) the defendant's business partner, CC-1, was convicted of a lead role in the scheme; (2) the defendant's wife received $10,000.00 on February 17, 2015 from AOHC, the Belize based bank account that ForceField's chairman used to pay CC-1 and other ForceField co-conspirators; and (3) on April 1, 2015, the defendant's wife received $20,000.00 from an escrow account also used by St Julien to pay ForceField co-conspirators. (PSR ¶ 19). In addition, transfer agent records for ForceField's stock indicate that on February 26, 2015, the defendant was issued a stock certificate for 15,000 shares of FNRG from Keystone Investments, Inc., a shell company owned by ForceField's chairman. (Id.).

II. The Plea Agreement, the PSR and the Sentencing Guidelines

On February 24, 2020, the defendant pled guilty pursuant to a plea agreement to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, as charged in the single-count information. (PSR ¶ 1; Plea Agreement; ECF No. 23). In the plea agreement, the defendant stipulated to the government's estimate that the defendant's adjusted offense level, assuming a two-point reduction for acceptance of responsibility, and a one-point reduction for pleading guilty would be 13, and that if the defendant was in Criminal History Category I, he would have a Guidelines range of 12-18 months' imprisonment. (Plea Agreement ¶ 2). The parties' stipulated offense level calculation was as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Plus: Loss Exceeded $150,000 (§ 2B1.1(b)(1)(F)) | +10 |
| Plus: Offense involved 10 or more victims (§ 2B1.1(b)(2)(A)) | +2 |
| Minus: Minor Participant (§ 3B1.2(b)) | -2 |
| Less: Acceptance of Responsibility (§ 3E1.1) | <u>-3</u> |
| Total Offense Level: | <u>13</u> |

Also as part of the plea agreement, the defendant agreed to pay restitution in the full amount as determined by the Court, and to forfeit $33,500. (Plea Agreement ¶¶ 1, 6).

On July 14, 2020, Probation issued its PSR in this case. (PSR). In the PSR, Probation reached the same offense level calculation as the parties. (Plea Agreement ¶ 2; PSR ¶

37). Specifically, Probation calculated the defendant's total offense level to be 13. (PSR ¶ 37). In accordance with this calculation and the defendant's criminal history category of I, this offense level corresponds to a Guidelines range of 12-18 months' imprisonment. (Id. ¶ 74).

Probation indicated that the defendant is liable for $223,564.97 in restitution (PSR ¶ 83) to the twenty-five victims, based upon records provided to Probation by the government.

III.  The Defendant's Objections to the PSR

While the defendant has stipulated to the applicable Sentencing Guidelines as set forth above, he contests several factual issues detailed in the PSR. The defendant's objections rehash objections that he filed to the original PSR (see Def. Memo, Ex. C), which the government responded to in an October 20, 2020 letter to Probation. A copy of the government's response to the defendant's objections to the PSR is attached as Exhibit D to the defendant's sentencing memorandum. (Def. Memo, Ex. D), which the government incorporates by reference here. In addition to the government's October 20, 2020 response, the government responds briefly below.

A.  The Defendant's Role

The defendant argues that the PSR mischaracterizes his role (Def. Memo at 9-11), and repeats objections that he previously made to the Probation Department regarding paragraphs 4, 10, 11, 12 and 13 of the PSR. (Compare Def. Memo, Ex. C (defendant's objections) with Id., Ex. D (government's response)). While the government agrees that the defendant should receive a minor participant role reduction, his role was nonetheless critical to the charged securities fraud conspiracy, and the paragraphs to which the defendant objects are accurate and should not be changed. Contrary to defendant's claim that his only role in the conspiracy was a single $5,000 payment to a corrupt stock broker in September 2015 (Def. Memo at 10), the defendant worked with CC-1 beginning in July 2014, and became CC-1's business partner in January 2015. CC-1 had primary responsibility for the bribe payments. That fact is of great moment here, because CC-1 and Auerbach were the only partners in their promotional business, and as noted above and in the PSR, Auerbach and his wife received multiple payments from ForceField's chairman. (PSR ¶ 19). ForceField was also a stock manipulation scheme where CC-1 was making undisclosed kickback payments to stock brokers, including CW-2, on behalf of the company's chairman. In sum, the defendant worked with CC-1 beginning in July 2014 and as a partner beginning in January 2015, and was involved in two separate stock manipulation schemes with CC-1, both of which involved kickbacks to stock brokers including CW-2. In the face of this evidence, the defendant's claim that he did not know that he was involved in fraudulent activity as to NXT-ID until September 2015 (when he paid a $5,000 kickback to CW-2) simply defies credulity. Rather, the evidence demonstrates that the defendant's participation in the corrupt scheme began from its inception in July 2014.

Moreover, the government opposes the defendant's objections to paragraph 12 of the PSR. (Def. Memo at 10). Paragraph 12 accurately quotes a March 3, 2015 email from NXT-ID's CEO to the defendant, "Can we get some support today," what the government's investigation indicates was the defendant's understanding of the email (that the CEO was asking the defendant to help artificially prop up NXT-ID's stock price) and the broker CW-2's stock

5

purchases of NXT-ID's stock that same day. This activity further illustrates the defendant's role in the fraud scheme.

### B. Allegations Regarding ForceField

Next, the defendant argues that his involvement in the ForceField stock fraud scheme should be stricken from paragraph 19 of the PSR. (Def. Memo at 11).

The government opposes the defendant's requested changes. The government has not sought any enhancement of the defendant's Sentencing Guidelines based upon the ForceField Energy ("ForceField") securities fraud scheme. The government will not ask for an upward departure based upon the conduct either. However, paragraph 19 should be included in the PSR because the Court can consider the ForceField conduct under 18 U.S.C. § 3553. The government believes that the defendant's participation in the ForceField scheme favors a Guidelines sentence of imprisonment here for the NXT-ID scheme for which the defendant pled guilty.

As set out in paragraph 19, in short, the defendant's former business associate and partner, CC-1, was convicted of making undisclosed payments on behalf of ForceField's CEO to corrupt registered brokers, including convicted defendant CW-2, to purchase ForceField on their client's behalf and to push up its stock price. ForceField rose to a market capitalization in excess of $130 million dollars based on the fraud scheme, but dropped to virtually nothing following the arrest of its CEO and revelation of the scheme. ForceField's CEO used an offshore bank account in the name of AOHC to wire payments to CC-1 in furtherance of the ForceField scheme. CC-1, in turn, made undisclosed payments to the corrupt brokers. The defendant's wife received $10,000 on February 7, 2015 from AOHC, and on February 26, 2015, Auerbach received 15,000 shares of ForceField's stock. In addition, on April 1, 2015, the defendant's wife received $20,000.00 from an escrow account also used by ForceField's CEO to pay ForceField co-conspirators.

Those facts are closely analogous to the NXT-ID securities fraud scheme to which the defendant pled guilty. Here, NXT-ID's CEO wired funds to the defendant's partner, CC-1 and the defendant, and they in turn made undisclosed payments to a registered broker involved in the ForceField scheme, CW-2, so that he would cause his clients to purchase NXT-ID's stock. Like the corrupt brokers in the ForceField scheme, CW-2 did not disclose these payments to his clients.

Accordingly, this evidence should be included in the PSR so that the Court can consider it under 18 U.S.C. § 3553.

### C. Allegations Concerning the Defendant's Post-Arrest Statement

The defendant argues that his post-arrest statements, which were in large part false, should be stricken from paragraph 22 of the PSR, because the defendant has not been charged with obstruction of justice. (Def. Memo at 12). The government opposes the defendant's requested

6

changes. The PSR accurately notes the defendant's post-arrest statements, which were recorded.[2] The government does not seek an enhancement for obstruction of justice here, but the defendant's false statements to law enforcement, including that his $5,000 kickback payment to CW-2 was a "loan," can be considered by the Court in fashioning an appropriate sentence under 18 U.S.C. § 3553.

### D. Restitution

Next, the defendant objects to the restitution calculated by Probation and owed to the twenty-five victims of the scheme, $223,564.97 (PSR ¶ 83). After consulting with defense counsel, and consideration of 18 U.S.C. 3664 and the facts here, the government and the defendant jointly recommend that the Court order the defendant to pay restitution in an apportioned amount of 50%, jointly and severally with CW-1.

The procedure for issuance and enforcement of an order of restitution is governed by 18 U.S.C. § 3664. That statute provides that "[i]f the court finds that more than one defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution, or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant." 18 U.S.C. § 3664(h).

Here, based upon the defendant's lesser role in the scheme, the government and the defendant request that the Court order the defendant to pay an apportioned amount of restitution in the amount of 50% of the $223,564.97 in victim losses (PSR ¶ 83), or $111,782.49, to the twenty-five victims of the scheme, jointly and severally with CW-1.

## IV. The Appropriate Sentence

### A. The Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

---

[2] If the defendant disputes his post-arrest statements, the government can call the case agent to testify and introduce a copy of the defendant's recorded statements.

>   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2) the need for the sentence imposed—
>
>   >   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   >
>   >   (B) to afford adequate deterrence to criminal conduct; [and]
>   >
>   >   (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

>   B. <u>Nature and Circumstances of the Offense</u>

As an initial matter, the defendant's conduct in this case was serious. He played a critical role in a scheme to defraud investors in NXT-ID by paying undisclosed kickbacks to stock brokers pushing the stock, and manipulate its stock price through this corrupt "market support." Corrupt activity such as this has serious ramifications for the financial system. Schemes like this one threaten the integrity of the financial system and investor confidence, and should be punished accordingly.

>   C. <u>History and Characteristics of the Defendant</u>

The defendant devotes much of his sentencing memorandum to addressing his family circumstances, career and religious involvement. (Def. Mem. at 16-21). However, the defendant is not unique in these respects as compared to many other white-collar defendants who come before the Court. Moreover, unlike most other white-collar defendants who are convicted for the first time, the defendant was closely involved in another, uncharged, securities fraud scheme. Accordingly, his personal circumstances do not justify a non-incarceratory sentence.

D.   The Need for Deterrence

A Guidelines sentence is also necessary here in order to ensure that the sentencing goals of specific and general deterrence are appropriately met. With regard to general deterrence, a Guidelines sentence will send a strong message that this type of criminal conduct will be punished with incarceration. Such a sentence will make plain that securities fraud offenses will not be tolerated. In addition, a Guidelines sentence would ensure specific deterrence as well, particularly, where, as here, the defendant was involved in multiple securities fraud schemes.

E.   Avoiding Unwarranted Sentencing Disparities

As the Court is aware, one of the factors the Court is required to consider pursuant to § 3553(a) is the need to avoid unwarranted sentencing disparities. See U.S.S.G. § 3553(a)(6). The defendant is similarly situated to many other defendants in this District who have committed securities fraud offenses involving significant sums, and those defendants have typically received custodial sentences. For example, in the securities fraud cases involving manipulation of ForceField's stock, Judge Cogan sentenced Jared Mitchell, who made approximately $237,549.33 from the scheme, to 36 months imprisonment. (See United States v. Mitchell et al., Criminal Docket No. 16-234 (BMC), ECF No. 331). Several other participants in that scheme also received incarceratory sentences. Christopher Castaldo, who made approximately $175,000, was sentenced to 24 months imprisonment. (Id., ECF No. 385). Registered broker Naveed Khan, who made approximately $49,000 from the scheme, was sentenced to 24 months imprisonment. (Id., ECF No. 323). Registered broker Gerald Cocuzzo, who made approximately $18,500 from the scheme, received a sentence of 18 months imprisonment. (Id., ECF No. 348).

Accordingly, the defendant here, who has agreed to forfeit $33,500 in ill-gotten gains from his offense, should receive an incarceratory term.

V. <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of imprisonment within the applicable Guidelines range of 12-18 months imprisonment, and order the defendant to pay $111,782.49 in restitution to the twenty-five victims of the scheme, jointly and severally with CC-1.

    Respectfully submitted,

    Seth D. DUCHARME
    Acting United States Attorney
    Eastern District of New York

By:     /s/
    Mark E. Bini
    Hiral D. Mehta
    Assistant U.S. Attorneys
    (718) 254-8761

cc:    Clerk of the Court (PKC) (By ECF)
       Roland G. Riopelle, Esq. (By ECF and E-mail)